Thy B. Bui, Esq. (SBN 256383)
tbui@maynardnexsen.com
Aaron M. Rutschman, Esq. (SBN 288273)
arutschman@maynardnexsen.com
David A. Crane, Esq. (SBN 305999)
dcrane@maynardnexsen.com
**MAYNARD NEXSEN LLP**
2121 Avenue of the Stars, Suite 650
Los Angeles, CA 90067
Telephone: 310.596.4500

Attorneys for Defendants
ELEVANCE HEALTH, INC.; THE ELEVANCE HEALTH COMPANIES, INC. (f/k/a THE ANTHEM COMPANIES, INC.); and SUSAN MILLET-REILLY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| LUIS A. ORTIZ,<br><br>Plaintiff,<br>v.<br><br>ELEVANCE HEALTH, INC., a corporation; ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, a corporation; BLUE CROSS OF CALIFORNIA, a corporation; THE ELEVANCE HEALTH COMPANIES OF CALIFORNIA, INC., a corporation; THE ELEVANCE HEALTH COMPANIES, INC., a corporation; THE ANTHEM COMPANIES, INC., a corporation, ANTHEM INSURANCE COMPANIES, INC., a corporation; SUSAN MILLET-REILLY, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 2:26-cv-13722<br><br>[*Removed from Los Angeles Superior Court Case No. 24STCV15952*]<br><br>**DEFENDANTS' NOTICE OF REMOVAL UNDER 28 U.S.C. §§ 1332, 1367, 1441 AND 1446 (DIVERSITY JURISDICTION)**<br><br>Complaint Filed: June 26, 2024<br>Removal Date: November 24, 2026 |

**TO THE CLERK OF THE ABOVE-TITLED COURT, PLAINTIFF LUIS ORTIZ, AND HIS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that Defendants Elevance Health, Inc., The Elevance Health Companies, Inc. (f/k/a The Anthem Companies, Inc.), and Susan Millet-Reilly (collectively "Defendants") hereby remove this action from the Superior Court of California, County of Los Angeles, to the United States District Court for the Central District of California. This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because complete diversity of citizenship exists and the amount in controversy exceeds $75,000, exclusive of interest and costs. Accordingly, this action is removable under 28 U.S.C. §§ 1441 and 1446. The following is a short and plain statement of the grounds for removal pursuant to 28 U.S.C. § 1446(a).

**PROCEDURAL BACKGROUND**

1. This case arises from Plaintiff Luis Ortiz's former employment with Defendant Elevance Health, Inc.

2. On June 26, 2024, Plaintiff filed this action in the Los Angeles County Superior Court ("LASC"), Case No. 24STCV15952 (the "State Court Action") alleging causes of action for: (1) disability harassment and discrimination in violation of the Fair Employment and Housing Act ("FEHA"); (2) failure to accommodate in violation of FEHA; (3) failure to engage in the interactive process in violation of FEHA; (4) retaliation for requesting an accommodation (FEHA); (5) retaliation (CFRA); (6) national origin discrimination (FEHA); (7) failure to prevent discrimination and harassment (FEHA); (8) retaliation (FEHA); (9) whistleblower retaliation (Lab. Code § 1102.5); (10) wrongful termination; (11) failure to provide personnel and wage records; (12) intentional infliction of emotional distress; and (13) negligent infliction of emotional distress..

3. Faced with federal jurisdiction if he sued only his former employer, Elevance Health, Inc., an Indiana Corporation, and his former manager, individual

Defendant Susan Millet-Reilly, a Connecticut resident, Plaintiff pursued a different course: name as many entities as possible to destroy diversity—six in total, including several California entities—regardless of whether they had any connection to his employment. That bad faith tactic may have delayed removal, but it cannot prevent this case from being heard in the proper venue.

## TIMELINESS OF REMOVAL

### <u>Defendants Removed This Case Within 30 Days of the First Order or Other Paper From Which It Could be Ascertained This Case Is Removable</u>

4. This removal is timely filed as required by 28 U.S.C. § 1446(b) having been accomplished within 30 days of the date that the state court granted the Motion for Summary Judgment of Defendants Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, The Elevance Health Companies of California, Inc., and Anthem Insurance Companies, Inc. (collectively the "Non-Employer Entities") on October 28, 2026, which was the first order or other paper from which it could be ascertained that this case is one which is removable. 28 U.S.C. § 1446(b)(3); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006) (noting that courts "don't charge defendants with notice of removability until they've received a paper that gives them enough information to remove.")

5. On September 16, 2026, the Honorable Alexander C.D. Giza issued a tentative ruling granting the Non-Employer Entities Motion for Summary Judgment. The tentative ruling observed that the state court "does not find ***any of the presented evidence to be indicative of employment under any applicable theory***." (emphasis added). The state court further noted, with regards to Plaintiff's theory that he applied for re-employment with Blue Cross of California, that "[t]he ***evidence overwhelmingly demonstrates*** that the applied employment was through [Elevance Health, Inc.], not [Blue Cross of California]." (emphasis added). *See* Defendants' Index of Exhibits In Support of Notice of Removal ("Defs.' Index of

Exhibits”), Volume 18, Exhibit 241.

6. Sometime thereafter, Judge Giza was elevated to the Second Appellate District, Division Three, resulting in multiple continuances of the hearing on the Non-Employer Entities’ Motion for Summary Judgment. The hearing was originally scheduled for August 31, 2026, but it was continued four times, to September 17, 2026, then to September 22, 2026, then to October 15, 2026, and finally to October 28, 2026. *See* Defs.’ Index of Exhibits, Volume 21, Exhibit 275; Volume 27, Exhibits 351, 357, 363.

7. On October 28, 2026, Judge Mark Borenstein granted the Non-Employer Entities’ Motion for Summary Judgment and held that “[t]here are no triable issues concerning the absence of an employment relationship between Plaintiff and the Moving Defendants, and no triable issues as to an alter ego relationship between Defendant Elevance Health, Inc. and the Moving Defendants.” *See* Defs.’ Index of Exhibits, Volume 28, Exhibit 371.

8. Until the state court granted the Non-Employer Entities’ Motion for Summary Judgment on October 28, 2026, there was no basis for removal. *Reyes v. Dollar Tree Stores, Inc.*, 781 F.3d 1185, 1188-89 (9th Cir. 2015) (rejecting the plaintiff’s contention that removal was untimely because it occurred more than 30 days after the state court issued its tentative ruling on a class certification motion, noting that “[t]he tentative ruling had no jurisdictional effect precisely because it was a tentative.”) *Id.* at 1189; *see also Sullivan v. Conway*, 157 F.3d 1092 (7th Cir. 1998) (“[u]ntil the state judge granted the motion to amend, there was no basis for removal. Until then, the complaint did not state a federal claim. It might never state a claim. Since the state judge might deny the motion.”) This is particularly true here, as Judge Giza issued the tentative ruling, while Judge Borenstein issued the final ruling.

9. Therefore, by filing their Notice of Removal within 30 days after the state court issued its Order granting the Non-Employer Entities’ Motion for

Summary Judgment, which resulted in complete diversity between the remaining parties as detailed below, Defendants timely removed this case to federal court.

**Plaintiff's Bad Faith Nullifies the "One Year Rule"**

10. If the basis of removal is diversity jurisdiction, as is the case here, then removal typically must occur within "[one] year after commencement of the action, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c)(1).

11. In 1988, Congress amended the removal statute to prohibit the removal of diversity cases more than one year after their commencement. This change was intended to encourage prompt determination of issues of removal in diversity proceedings, and it sought to avoid the disruption of state court proceedings that might occur when changes in the case made it subject to removal. The change, however, led some plaintiffs to adopt removal-defeating strategies designed to keep the case in state court until after the one-year deadline passed. *Tedford v. Warner-Lambert Co.*, 327 F.3d 423, 426 (5th Cir. 2003) ("Section 1446(b) is not inflexible, and the conduct of the parties may affect whether it is equitable to strictly apply the one-year limit.")

12. In 2011, Congress added the bad-faith exception to the one-year procedural time bar to removal. 28 U.S.C. § 1446(c)(1). The amendment allows a defendant to remove a case after one year when "the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action." 28 U.S.C. § 1446(c)(1); *NKD Diversified Enterprises, Inc. v. First Mercury Ins. Co.*, No. 1:14-CV-00183-AWI, 2014 WL 1671659, at *3 (E.D. Cal. Apr. 28, 2014) *report and recommendation adopted*, No. 1:14-CV-00183-AWI, 2014 WL 2619599 (E.D. Cal. June 6, 2014) ("the one year limitation [is] procedural and can be excused upon a showing of bad faith.")

13. While the Ninth Circuit has not provided a strict standard by which to evaluate the bad faith exception, a number of California district court cases have

addressed the standard. *See, e.g., Weber v. Ritz-Carlton Company, LLC*, No. 4:18-cv-03351-KAW, 2018 WL 4491210, at *3 (N.D. Cal. Sept. 19, 2018) *citing Aguayo v. AMCO Insurance, Co,.*, 59 F. Supp. 3d 1225, 1263 (D.N.M. 2014) ("If a plaintiff does not actively litigate against a non-diverse defendant, then bad faith is established"). California district courts have found "bad faith" where the plaintiff intentionally engaged in removal-defeating strategies designed to keep the case in state court after the one-year deadline. *Heller v. American States Insurance Co.*, No. CV 15-9771 DMG (JPRx), 2016 WL 1170891, at 2–3 (C.D. Cal. Mar. 25, 2016) ("the totality of the circumstances in this case weigh against a finding of sufficient diligence and are highly indicative of 'strategic gamesmanship' intended to prevent removal" where the plaintiff never served any discovery directly on the non-diverse defendant or served any discovery generally to solicit evidence in support of his claims against the non-diverse defendants).

14. Courts across the country have applied Section 1446(c)(1) to preclude plaintiffs from engaging in manipulative tactics designed to defeat removal. This Court should do so as well, as there is significant evidence that Plaintiff and his counsel acted in bad faith to prevent removal and to secure their preferred forum.

15. The bad faith exception typically entails a two-step standard. "First, the Court looks to whether the plaintiff actively litigated against the removal-spoiling defendant in state court: asserting valid claims, taking discovery, negotiating settlement, seeking default judgments if the defendant does not answer the complaint, et cetera. ***If the plaintiff did not actively litigate against the removal spoiler, then bad faith is established***; if the plaintiff actively litigated against the removal spoiler, then good faith is rebuttably presumed. In the standard's second step, the defendant may attempt to rebut the good-faith presumption with direct evidence of the plaintiff's subjective bad faith. Although the Court will allow subjective evidence at the second step, the Court will only permit defendants to use the evidence they already have on hand, and will not

permit discovery or provide an evidentiary hearing on the bad-faith issue." *Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225, 1263 (D.N.M. 2014) (emphasis added).

16. The "bad faith" exception applies when a plaintiff brings claims against a sham defendant without any intent to pursue them to judgment. *See Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 292-94 (5th Cir. 2019) (affirming finding of bad faith when plaintiff pursued the claims "only half-heartedly"); *see also Hall v. Cole*, 412 U.S. 1, 15 (1973) ("'[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation.")

17. Determining whether a plaintiff has acted in bad faith to prevent removal necessarily involves looking into the plaintiff's subjective intent, as the text of section 1466(c)(1) "strongly suggest[s] intentionality and purpose." *Aguayo*, 59 F. Supp. 3d at 1263. Many courts have found bad faith where the plaintiff failed to pursue his claims against the non-diverse defendant. *See, e.g.*, *Hoyt*, 927 F.3d at 292 (plaintiffs dismissed resident defendant two days after one-year deadline expired without receiving any consideration, and plaintiffs pursued their claim against resident defendant only half-heartedly); *McNeal v. Found. Radiology Grp.*, 636 F. Supp. 3d 794, 797 (E.D. Mich. 2022) (finding bad faith where plaintiff sent Defendants a request for admission that the resident defendant "was an employee and/or acting as an agent of" the nondiverse Defendants, "[b]ut during the next nine months, Plaintiff did not seek any additional discovery related to the issue. Instead, he waited until three months after the one-year removal deadline to dismiss the nondiverse Defendants with no coherent explanation." *Heller*, 2016 WL 1170891, at *3 (plaintiff never served any discovery directly on the non-diverse defendant or served any discovery generally to solicit evidence in support of his claims against the non-diverse defendants); *In re Rezulin Prods. Liab. Litig.*, 2003 WL 21355201, at *2 (S.D.N.Y. 2003) (concluding that "strategic behavior was at play" by noting that "plaintiffs took no discovery from the [nondiverse] physician" before dismissing claim against him).

18. Here, Plaintiff and his counsel indisputably acted in bad faith to prevent removal by: (1) refusing to respond to discovery aimed at soliciting evidence supporting the allegations in the Complaint that the Non-Employer Entities jointly employed Plaintiff; (2) intentionally delaying Plaintiff's deposition; (3) obstructing the first session of Plaintiff's deposition, where Defendants' sought to solicit testimony regarding the allegations in the Complaint that the Non-Employer Entities jointly employed Plaintiff; (4) Plaintiff's refusal to answer questions at the first session of his deposition regarding his belief that the Non-Employer Entities jointly employed him; (5) offering to voluntarily dismiss three of the four Non-Employer Entities in exchange for an agreement to remain in state court; and (6) Plaintiff's failure to pursue any of his claims alleged against the Non-Employer Entities over a period of more than two and a half years. These actions and inactions, viewed independently and collectively, confirm Plaintiff's bad faith efforts to defeat diversity jurisdiction and secure his preferred state-court forum. Each of these actions had a domino effect, resulting in repeated meet-and-confer efforts, motion practice, and multiple deposition sessions to obtain basic testimony about Plaintiff's beliefs and his allegations that the Non-Employer Entities jointly employed him. This delayed the discovery necessary to obtain the summary judgment order establishing the basis for removal.

**1. <u>Plaintiff Intentionally Stonewalled Written Discovery</u>**

19. Defendants' Motion to Compel Arbitration was denied on December 27, 2024. Rutschman Decl. ¶ 3.

20. On January 21, 2025, Elevance Health, Inc. promptly propounded its Special Interrogatories (Set One) to Plaintiff. Special Interrogatory Nos. 1-3 and 6 asked Plaintiff to "states all facts" supporting his contention that the Non-Employer Entities employed him, as alleged in the Complaint. Special Interrogatory Nos. 10, 12, and 14 asked Plaintiff to state all facts supporting the allegations in the Complaint that the Non-Employer Entities act as "an integrated

enterprise, joint employers, and alter egos of one another" (No. 10) that these entities constitute "joint employers, with employment decisions, recruitment, policies and control emanating from all of the integrated entities" (No. 12), and that they act as a single employer (No. 14). *See* Declaration of Aaron M. Rutschman ("Rutschman Decl.") ¶ 4.

21. On February 24, 2025, Plaintiff improperly served objection-only responses, remarkably objecting that, in part, the interrogatories sought information that was not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Rutschman Decl. ¶ 5.

22. Following protracted meet and confer efforts, on May 14, 2025, Plaintiff supplemented his responses to Elevance Health, Inc.'s Special Interrogatories (Set One). In response to Special Interrogatory Nos. 1-3, 6, 10, 12, and 14 Plaintiff copied and pasted the same hollow response that he "is not a lawyer and, thus, does not have personal knowledge as to the legal meaning of 'joint employer,' 'integrated enterprise/single employer,' or 'alter ego.'" Beyond asserting other inapplicable objections, Plaintiff claimed that responding to Special Interrogatory Nos. 1-3, 6, 10, 12, and 14 would necessitate the preparing of a compilation, abstract, audit, or summary of his Complaint, Defendants' "annual and quarterly reports on file with the U.S. Securities and Exchange Commission, and pertinent [but unspecified] filings with the California Secretary of State." In other words, Plaintiff's bad faith supplemental responses remained entirely deficient. Rutschman Decl. ¶ 6.

23. On June 23, 2025, Elevance Health sent Plaintiff another meet and confer letter. Regarding Special Interrogatory Nos. 1-3 and 6, the letter noted that "[i]f Plaintiff contends that each of these entities employed him, he needs to state all facts supporting those allegations. If Plaintiff declines to amend his response, Defendants will file a motion to dismiss those entities from this case as the referenced annual and quarterly reports do not evidence a former employment

relationship." Regarding Special Interrogatory Nos. 10, 12, and 14, the letter noted that these interrogatories "seek facts supporting Plaintiff's contention that the entities identified above acted as joint employer, given that Plaintiff alleges **seven (7) different entities simultaneously employed him.** Plaintiff must provide the request information in amended responses." (emphasis in original). Rutschman Decl. ¶ 7, Ex. A.

24. On August 15, 2025, ***nearly eight months after the interrogatories were originally served***, Plaintiff further supplemented his responses to Elevance Health, Inc.'s Special Interrogatories (Set One). Plaintiff once again emphasized that he is "not a lawyer," only to follow that disclaimer with a series of identical responses so densely laden with legalese that they may well be the most lawyerly responses in the history of written discovery:

> "[A]s set forth in the COMPLAINT, Elevance Health, Inc., Anthem Blue Cross Life And Health Insurance Company, Blue Cross Of California, The Elevance Health Companies of California, Inc., The Elevance Health Companies, Inc., The Anthem Companies, Inc., Anthem Insurance Companies, Inc. are corporations or other business entities doing business in the State of California. Elevance Health, Inc. is a corporation incorporated in Delaware with its principal executive offices located in Indiana. According to its annual reports, it purports to be 'one of the largest health insurers in the United States,' with extensive businesses, brands and products (including 'Anthem Blue Cross/Anthem Blue Cross and Blue Shield,' 'Wellpoint,' and 'Carelon)'. It is a massive conglomerate with hundreds of subsidiaries, agents, and affiliated entities throughout the U.S., including California, and does business under many names, including Elevance, Anthem, and Anthem Blue Cross. As set forth in the COMPLAINT, Elevance Health, Inc., Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, The Elevance Health Companies of California, Inc., The Elevance Health Companies, Inc., The Anthem Companies, Inc., and Anthem Insurance Companies, Inc. are an entangled web of over-lapping and highly coordinated, related entities that constitute and act as an integrated enterprise and joint employers. They are, together, an integrated enterprise and/or 'single employer' for purposes of the unlawful employment practices alleged in this matter, exhibiting,

among other things, interrelation of operations, common management, centralized control of labor relations, and common ownership and financial control. They share common officers, directors, corporate locations, operations, finances and policies. Indeed, the enterprise acknowledges, in its annual 10-K corporate reports, that the terms 'we,' 'our,' 'us,' 'Anthem,' 'Elevance Health,' or the 'Company' refer collectively to the company and all of its direct and indirect subsidiaries. This Anthem/Elevance/Blue Cross enterprise files consolidated financial and operational reports, they share directors, officers, owners, managers, have common corporate addresses, and consolidate their employment oversight in a common human resources department. In addition to constituting an integrated enterprise, this network of entities constitutes joint employers, with employment decisions, recruitment, policies and control emanating from all of the integrated entities. Defendant Anthem Blue Cross Life and Health Insurance Company is a corporation incorporated in California with its principal offices located at 21215 Burbank Blvd., Woodland Hills, California. The company shares a significant number of common officers, directors, and management with the other business entity defendants. For example, its Chief Governance Officer and Corporate Secretary is Kathleen Susan Kiefer, who is also the Chief Governance Officer and Corporate Secretary of defendants Elevance Health, Inc., Blue Cross of California, The Elevance Health Companies of California, Inc., The Elevance Health Companies, Inc., and Anthem Insurance Companies, Inc. As another example, its CEO is Beth Ellen Anderson, who is also the CEO of defendants Blue Cross of California, and The Elevance Health Companies of California, Inc. Defendant Blue Cross of California (which, according to the SEC Form 10K filed by defendant Elevance Health, Inc., does business as 'Anthem Blue Cross') is a corporation incorporated in California with its principal offices located at 21215 Burbank Blvd., Woodland Hills, California. The company shares a significant number of common officers, directors, and management with the other business entity defendants. For example, its Chief Governance Officer and Corporate Secretary is Kathleen Susan Kiefer, who is also the Chief Governance Officer and Corporate Secretary of defendants Elevance Health, Inc., Blue Cross of California, The Elevance Health Companies, Inc., and Anthem Insurance Companies, Inc. As another example, its CEO is Beth Ellen Anderson, who is also the CEO of defendants Anthem Blue Cross Life and Health Insurance Company, and The Elevance Health Companies of California, Inc. Defendant The Elevance Health Companies of California, Inc. is a corporation

incorporated in California with its principal offices located at the same address as the principal offices of defendant Elevance Health, Inc. The company shares a significant number of common officers, directors, and management with the other business entity defendants. For example, its Chief Governance Officer and Corporate Secretary is Kathleen Susan Kiefer, who is also the Chief Governance Officer and Corporate Secretary of defendants Elevance Health, Inc., Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, The Elevance Health Companies, Inc., and Anthem Insurance Companies, Inc. Among other obligations as an employer, defendant Elevance Health Companies of California, Inc. is responsible for maintaining employee payroll records and wage statements. In November 2022, Mr. Ortiz applied for an open underwriting position. The hiring manager was Roxana Sadigh of Anthem Blue Cross. The position was located at 21215 Burbank Avenue in Woodland Hills, California. The position was to be supervised by Blue Cross of California, Inc. Defendants Elevance Health Companies of California, Inc. and Elevance Health Companies, Inc. maintained, processed and administered payment of wages, payroll records, and wage statements. Discovery is continuing and Plaintiff specifically reserves the right to amend his response or to provide further information upon request as depositions are taken and discovery is obtained."

Surely, Plaintiff, who noted in his responses multiples times that he "is not a lawyer," did not provide these "facts" to his counsel for purposes of responding to Special Interrogatories (Set One). Rutschman Decl. ¶ 8, Ex. B.

**2. <u>Plaintiff's Counsel Delayed Providing Dates for Plaintiff's Deposition</u>**

25. Notwithstanding the fact that Plaintiff's responses remained deficient, the same day that Plaintiff served them, on August 15, 2025, Elevance Health's counsel requested dates for Plaintiff's deposition to proceed in September. Rutschman Decl. ¶ 9, Ex. C. Elevance Health's counsel followed up on August 18, August 26, September 2, and September 4 to solicit Plaintiff's availability for his deposition. *Id.*

26. On September 5, 2025, Plaintiff's counsel finally responded and

proposed a single date in October for Plaintiff's deposition. On September 9, 2025, Elevance Health's counsel responded that the proposed date did not work and asked Plaintiff's counsel to provide "*multiple*, alternate dates." (emphasis in original). Yet, over the next week, Plaintiff's counsel offered only two additional dates, one date per email, that both conflicted with Elevance Health's counsel's schedule. *Id*.

27. On September 16, 2025, Elevance Health's counsel proposed four dates in October for Plaintiff's deposition, and followed up regarding those dates on September 18, 2025. After more than a month of efforts to secure a mutually agreeable date, Plaintiff finally agreed to be deposed on October 17, 2025. *Id*.

**3. <u>Plaintiff's Counsel Obstructed Plaintiff's Deposition and Plaintiff Refused to Answer Questions About The Non-Employer Entities</u>**

28. On October 17, 2025, Elevance Health, Inc. took the first session of Plaintiff's deposition. During the deposition, Elevance Health's counsel asked questions that any competent attorney would ask, among others, why did Plaintiff believe each of the entities he named as Defendants (besides Elevance Health, Inc.) employed him. Throughout the deposition, Plaintiff's counsel, James C. D. Carr, routinely obstructed with speaking objections, coached Plaintiff on the record, testified on Plaintiff's behalf, engaged in unnecessary colloquy, asserted improper "form" objections without specifying the nature of the "form" objected to, asserted inapplicable *Rifkind* objections to questions that did not call for legal contentions, and instructed Plaintiff not to answer questions without a proper basis. Mr. Carr's objective was clear: to frustrate the purpose of Plaintiff's deposition and to prevent him from providing testimony that could support a motion to dismiss the Non-Employer Entities, thereby establishing complete diversity. Rutschman Decl. ¶ 10. As noted below, the state court ultimately ordered Mr. Carr to pay $1,500 in monetary sanctions, finding that he engaged in obstructive behavior. *Id.*

/ / /

**4. Plaintiff Refused to Answer Questions At Deposition About His Joint Employer Theory**

29. Beyond Mr. Carr's blatant obstruction, Plaintiff regurgitated the same scripted response to basic questions about the factual basis for his alleged employment relationship with the Non-Employer Entities, including why he believed each entity employed him, whether he received an offer letter, received or signed any documents evidencing an employment relationship, received a Form W-2, or was ever told by anyone that any of the entity Defendants employed him. Rutschman Decl. ¶ 11.

30. As a result of Mr. Carr's obstruction and Plaintiff's evasive non-answers, on December 2, 2025, Elevance Health filed a motion to compel Plaintiff to provide further testimony in response to twenty-two questions, and seeking monetary sanctions against Mr. Carr, a protective order, and a discovery referee at Plaintiff's and his counsel's expense. Rutschman Decl. ¶ 12; Defs.' Index of Exhibits, Volume 15, Exhibit 181.

31. On February 23, 2026, the state court granted Elevance Health's motion in part. The state court ordered Plaintiff to further answer under oath twenty-one of the twenty-two questions at issue, and ordered Mr. Carr to pay $1,500 in monetary sanctions, finding that he engaged in obstructive behavior. Rutschman Decl. ¶ 13; Defs.' Index of Exhibits, Volume 18, Exhibit 225.

32. Importantly, a great majority of the questions that the state court ordered Plaintiff to answer at the second session of his deposition pertained to his joint employer theory against the Non-Employer Entities:

- (1) Did anyone ever tell you that you were employed by Anthem Blue Cross Life and Health Insurance Company?
- (2) Who told you that you worked for Anthem Blue Cross Life and Health Insurance Company?
- (3) When did [Plaintiff's former manager John] Yun tell you that you

were employed by Anthem Blue Cross Life and Health Insurance Company?

- (4) Sitting here today, are you able to specifically recall receiving any documentation that you were employed by Anthem Blue Cross Life and Health Insurance Company?
- (5) What documents did you sign that showed that you were employed by Anthem Blue Cross Life and Health Insurance Company?
- (6) Is it your testimony that your offer letter stated that you worked for Anthem Blue Cross Life and Health Insurance Company?
- (7) Did you ever receive any wages statements from Anthem Blue Cross Life and Health Insurance Company?
- (8) Did anyone ever tell you that you were employed by The Anthem Companies, Inc?
- (9) Did you ever sign any documents that you were employed by The Anthem Companies, Inc.?
- (10) Did the Anthem Companies, Inc. ever provide you with a paycheck?
- (11) Did you ever receive a Form W-2 from The Anthem Companies, Inc.
- (12) Did anyone ever tell you that you were employed by Anthem Insurance Companies, Inc.?
- (13) Did anyone ever tell you that you were employed by The Elevance Health Companies, Inc.?
- (14) Have you ever reviewed Elevance Health's financial statements filed with the SEC?
- (15) Are references to "The Enterprise" in your performance reviews a reason why you believe that you were employed by all of the entities in "The Enterprise"?

Rutschman Decl. ¶ 14.

33. On March 17, 2026, Elevance Health's counsel resumed Plaintiff's

deposition, during which Plaintiff answered the aforementioned questions, including as to all of the Non-Employer Entities, and he finally provided the bulk of the testimony on which the Non-Employer Entities based their Motion for Summary Judgment. Rutschman Decl. ¶ 15. *Brown v. Wal–Mart Stores, Inc.,* No. 5:13–cv–00081, 2014 WL 60044, *2 (W.D. Va. Jan.7, 2014) (plaintiff's failure to provide information on the amount of damages until eight days after the one-year period had passed fell within the bad-faith exception to the one-year removal rule).

34. On May 22, 2026, the Non-Employer Entities filed their Motion for Summary Judgment, which sought dismissal on the grounds that Plaintiff named them as a bad faith tactic to delay removal, they had absolutely no connection to his prior employment with Elevance Health, Inc. or any authority to control his employment, and there was no support for Plaintiff's scattershot of alternative theories—integrated enterprise, agency, alter ego, and joint venture. Finally, the Motion for Summary Judgment argued that Plaintiff applied for re-employment with Elevance Health, Inc., and not Blue Cross of California, and the rejection of his application by Elevance Health, Inc. could not impose potential liability on Blue Cross of California. Rutschman Decl. ¶ 16; Defs.' Index of Exhibits, Volume 20, Exhibit 247.

**5. <u>Plaintiff Offered to Voluntarily Dismiss 3 of the 4 Non-Employer Entities After the One-Year Mark</u>**

35. On August 25, 2026, and *before* he filed his Opposition papers, Plaintiff offered to voluntarily dismiss Anthem Blue Cross Life and Health Insurance Company, Anthem Insurance Companies, Inc., and The Elevance Health Companies, of California, Inc. The offer was contingent, among other things, on the Non-Employer Entities' withdrawal of their Motion for Summary Judgment. In other words, Plaintiff offered to dismiss three of the four nondiverse defendants, but insisted that one remain in the case and that the summary judgment motion be withdrawn—thereby ensuring that complete diversity would not exist and the case

would remain in state court. Rutschman Decl. ¶ 17, Ex. E.

36. In response, on August 26, 2026, Defendants' counsel rejected Plaintiff's offer and proposed that Plaintiff voluntarily dismiss all of the Non-Employer Entities with prejudice. Defendants' counsel noted that:

> "Plaintiff never had a legitimate factual or legal basis to name any of these entities in the first place, and we are confident our pending motion will result in their dismissal with prejudice. Tellingly, Plaintiff has kept these entities in the case for more than two years without propounding a single discovery request to them or pursuing a PMQ deposition to uncover any evidence supporting his farfetched joint-employer theory. That is not a good-faith effort to develop a legal position—it is evidence that Plaintiff named these non-diverse entities as a litigation tactic to defeat diversity jurisdiction and secure his preferred state-court forum. Plaintiff then maintained his unsupported claims against these entities without any meaningful effort to substantiate them."

Rutschman Decl. ¶ 18, Ex. F. Plaintiff's counsel never even responded. *Id.*

**6. <u>Plaintiff Never Pursued His Claims Against the Non-Employer Entities</u>**

37. Most tellingly, Plaintiff failed to pursue his claims against the Non-Employer Entities from the very beginning of this lawsuit.

38. On August 19, 2024, Plaintiff served initial written discovery consisting of form interrogatories, special interrogatories, and requests for production on his former employer only, Elevance Health, Inc. Rutschman Decl. ¶ 19.

39. On August 23, 2024, Defendants' counsel emailed Plaintiff's counsel for introductory purposes and to request a 15-day extension of time for Defendants to file their responsive pleading. The email expressly noted that "it is unclear why Plaintiff named so many entity defendants (7 total!), however, we can confirm that Elevance Health, Inc. was Plaintiff's prior employer. It appears Plaintiff already knew this, as Elevance Health, Inc. was the only entity apparently served with

written discovery. Regardless, this email is to also request that Plaintiff voluntarily dismiss all of the other entity defendants, who have absolutely no connection to this lawsuit. Please let us know if this is agreeable. If not, please explain why not." Rutschman Decl. ¶ 20, Ex. G.

40. In a half-hearted attempt to address Defendants' request that Plaintiff voluntarily narrow the parties at issue in this case, on August 30, 2024, Plaintiff instead served identical sets of Form Interrogatories (Employment Law, Set One), on the Non-Employer Entities. *Id.* ¶ 21, Ex. H. Critically, those interrogatories did not seek any information related to Plaintiff's position that the Non-Employer Entities jointly employed him, or his alternate alter ego, integrated enterprise, agency, or joint venture theories.

41. On October 21, 2024, the Non-Employer Entities appropriately responded with objection-only responses to avoid waiver, and cited being third-party beneficiaries of Plaintiff's arbitration agreement with Elevance Health, Inc. Rutschman Decl. ¶ 22, Ex. I. Additionally, the objections to each interrogatory expressly stated that "Defendant objects to this interrogatory as being propounded for the improper purpose of harassing Defendant, on the grounds that there was no employment relationship between Defendant and Plaintiff, the fact of which Plaintiff and his counsel have been made aware." *Id.*

42. On October 28, 2024, Defendants filed their Motion to Compel Arbitration. Rutschman Decl. ¶ 3. As noted above, the Motion was denied on December 27, 2024. *Id.*

43. Yet, after the Non-Employer Entities served their objection-only responses on October 21, 2024 and through this removal, **Plaintiff did nothing to pursue his claims against them.** He did not follow up to request that the Non-Employer Entities supplement their responses, engage in any meet and confer efforts, pursue an informal discovery conference with the state court, file a motion to compel further responses, propound ***any*** additional written discovery on the

Non-Employer Entities, or seek to depose a person most qualified or anyone else regarding who employed Plaintiff, or to solicit ***any*** evidence supporting his joint employer, alter ego, or joint venture theories.

44. Put simply, during the **nearly 900 days** that the Non-Employer Entities were named Defendants in this lawsuit, Plaintiff **never took a single meaningful step to pursue his claims against them**, develop evidence supporting his theories of joint employer liability, alter ego, or joint venture, or otherwise demonstrate any genuine intent to obtain a judgment against them. His complete failure to prosecute his claims against the Non-Employer Entities, despite having ample opportunity to do so, confirms that their joinder was a jurisdiction-defeating device rather than a good-faith effort to obtain relief against parties Plaintiff genuinely intended to hold liable. (S.D. Texas May 16, 2023) ("Plaintiffs' half-hearted pursual of the claims against the forum Defendants is not sufficient to convince this Court that Plaintiffs ever intended to pursue a claim against forum Defendants. Thus, it can only be concluded that the forum Defendants inclusion in this action was for the sole purpose of preventing removal.")

45. For all of the above-mentioned reasons, the "one-year rule" poses no impediment to the removal of this case because Plaintiff acted in "bad faith" to delay removal. 28 U.S.C. § 1446(c)(1).

**THE VOLUNTARY-INVOLUNTARY RULE DOES NOT BAR REMOVAL OF FRAUDULENTLY JOINED DEFENDANTS**

46. As noted above, if the initial pleading does not provide grounds for removability, the defendant may remove the action within 30 days from receiving an "amended pleading, motion, order or other paper from which it may be first ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). This second 30-day opportunity for removal is known as the "other paper" exception, and it is subject to the judicially created "voluntary-involuntary rule." *Self v. Gen. Motors Corp.*, 588 F.2d 655, 657–58 (9th Cir. 1978).

47. Under the voluntary-involuntary rule, when joinder of nondiverse defendants prevents removal, a case becomes removable only through the plaintiff's voluntary dismissal or nonsuit of the nondiverse defendants. *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 295 ("'Where the case is not removable because of joinder of defendants,' *only* 'the voluntary dismissal or nonsuit by [the plaintiff] of a party or the parties defendant' can convert a nonremovable case into a removable one.").

48. However, "the voluntary-involuntary rule is *itself* subject to a judicially created exception for improper joinder." *Id.* citing *Great N. Ry. Co. v. Alexander*, 246 U.S. 276, 282 (1918). When a non-diverse defendant is improperly joined to defeat diversity jurisdiction, the doctrine of fraudulent joinder renders the voluntary-involuntary rule inapplicable. *Id.; see also Insinga v. LaBella,* 845 F.2d 249, 254 (11th Cir.1988) ("Fraudulent joinder is a well-established exception to the voluntary-involuntary rule.").

49. From the time it first recognized the fraudulent joinder doctrine, the Supreme Court has made clear that "[o]n the question of removal," courts should look at "whether there was a real intention to get a joint judgment," as well as "whether there was a colorable ground for it." *Chi., Rock Island & Pac. Ry. Co. v. Schwyhart*, 227 U.S. 184, 194 (1913). Permitting plaintiffs to thwart federal jurisdiction by suing sham defendants with no intent to seek a judgment would undermine the doctrine's entire purpose: to prohibit "devices intended to prevent a removal to a Federal court where one has that right." *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907).

50. And there can be no doubt that this is what Plaintiff's counsel was up to when they named seven distinct entities as Defendants and alleged them to be joint employers, alter egos, and joint ventures of each other.

51. As detailed above, throughout the pendency of his lawsuit, Plaintiff propounded only a single, redundant set of Form Interrogatories (Employment

Law) on the Non-Employer Entities on August 27, 2024. The Non-Employer Entities appropriately responded with objection only responses and Plaintiff thereafter did nothing to secure supplemental responses, or pursue any other evidence to support his claims against the Non-Employer Entities.

52. Plaintiff's complete failure to prosecute his claims against the Non-Employer Entities, despite having ample opportunity to do so, confirms that their joinder was a jurisdiction-defeating device and not a good-faith effort to obtain relief against parties Plaintiff genuinely intended to hold liable.

53. Therefore, it is clear that the Non-Employer Entities were fraudulently joined based on Plaintiff's lack of any real intention to pursue his claims against them. *See Beal v. Armstrong Containers, Inc.*, 2023 WL 6441348, at *5 (E.D. Wis.) (considering whether a plaintiff has "no real intention in good faith to prosecute the action against the [in-state] defendant or seek a joint judgment"); *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 257 F. Supp. 3d 717, 720 (E.D. Pa. 2017) (finding fraudulent joinder where "the circumstances ... evince no intent on the part of the plaintiffs to pursue claims" against non-diverse defendant); *Garner v. Union Pac. R.R. Co.*, 2015 WL 7352281, at *4 (E.D. Mo.) ("[J]oinder may be fraudulent where the plaintiff has no real intention of prosecuting the action against the resident defendant." (cleaned up)); *Arriaga v. New England Gas Co.*, 483 F. Supp. 2d 177, 184 (D.R.I. 2007) ("lack of a good-faith intent to prosecute a claim asserted against a nondiverse defendant may make joinder of that defendant fraudulent even though the claim is well founded"); *Ramirez v. Michelin N. Am., Inc.*, 2007 WL 2126635, at *5 (S.D. Tex.) (finding fraudulent joinder where "none of the Plaintiffs in this case have a good faith intent to pursue or follow-through on their claims or allegations of negligence against" the non-diverse defendant); *Linnin v. Michielsens*, 372 F. Supp. 2d 811, 819-24 (E.D. Va. 2005) (assessing whether plaintiff's conduct manifests a real intent to pursue a joint judgment); *Joe v. Minn. Life Ins. Co.*, 257 F. Supp. 2d 845, 850 (S.D. Miss.

2003) (finding fraudulent joinder where plaintiff had "no good faith intention of prosecuting her claim against these resident defendants"); *Sci. Computs., Inc. v. Edudata Corp.*, 596 F. Supp. 1290, 1292 (D. Minn. 1984) ("Joinder is a sham if the plaintiff has no real intention to obtain a joint judgment."); *Lewis v. Time Inc.*, 83 F.R.D. 455, 465 (E.D. Cal. 1979) ("[A] joinder is also fraudulent although a cause of action is stated if in fact no cause of action exists, or there is no intention to secure a joint judgment."), *aff'd*, 710 F.2d 549 (9th Cir. 1983); 14C Wright & Miller, *Fed. Prac. & Proc.* § 3723.1 n.5 (4th ed. 2025) (citing other cases).

54. It is equally clear that the Non-Employer Entities were fraudulently joined because Plaintiff is unable to establish a cause of action against them in state court. *Travis v. Irby,* 326 F.3d 644, 646–47 (5th Cir.2003) (fraudulent joinder can be established by demonstrating "inability of the plaintiff to establish a cause of action against the non-diverse party in state court."); *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 292-94 (5th Cir. 2019) (resident construction company that obtained summary judgment in its favor had been improperly joined, and therefore voluntary-involuntary rule did not apply). In *Hoyt v. Lane Construction Corp.*, 927 F.3d 287, 295 n.4 (5th Cir. 2019), the Fifth Circuit identified an independent reason the nondiverse defendant could not remain in the case: the state court had already granted summary judgment in its favor, and the claims against it were "meritless for all the reasons the district court already gave." Thus, the summary judgment ruling independently established that the plaintiffs could not maintain their claims against the nondiverse defendant, regardless of appealability, and supporting a finding of improper joinder. *Id.*

## DIVERSITY JURISDICTION

55. **Basis of Original Jurisdiction.** Defendants are entitled to remove the State Court Action on the ground that this Court has original jurisdiction in this action pursuant to 28 U.S.C. § 1332 and it is an action which may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. § 1441(b)

because: (1) The Elevance Health Companies, Inc. ("TEHCI") was formerly known as The Anthem Companies, Inc.; (2) this action is a civil action between citizens of different states, as Plaintiff is a citizen of California, and Defendants Elevance Health, Inc. and TEHCI are citizens of Indiana, and individual Defendant Susan Millet-Reilly is a citizen of Connecticut; and (3) this action involves an amount in controversy that exceeds the sum of $75,000, exclusive of interests, because Plaintiff alleges that he suffered economic damages, non-economic damages, punitive damages, and attorneys' fees as further detailed below.

56. **Plaintiff's Citizenship.** For diversity purposes, an individual's citizenship is determined by the individual's domicile. *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983). A person's domicile is his permanent home, where he resides with the intent to remain or to which he intends to return. *See Lew v. Moss*, 797 F.2d 747, 749-50 (9th Cir. 1986).

57. An individual's residence is presumed to be their domicile unless it is disputed. *Tsoi Sim v. United States*, 116 F. 920, 923 (9th Cir. 1902). "The place where a person lives is taken to be his domicile until facts adduced establish the contrary, and a domicile, when acquired, is presumed to continue until it is shown to have been changed." *Id.* (*quoting Anderson v. Watts*, 138 U.S. 694, 706 (1891)).

58. Although *Tsoi* and *Anderson* were decided over 100 years ago, they remain good law. In *Tanner v. Ford Motor Company*, the Court found that the plaintiffs' domicile was established where plaintiffs stated that they are residents of Alameda County in their Complaint for damages. *See Tanner*, 424 F. Supp. 3d 666, 673 (N.D. Cal. 2019) (following *Anderson*.) The Court stated that evidence of a person's place of residence is *prima facie* proof of domicile. *Id.*

59. Like the plaintiffs in *Tanner*, Plaintiff has alleged in his Complaint that he resides in Los Angeles County, California. (*See* Defs. Index of Exhibits, Volume 1, Ex. 3, Compl. ¶ 3.) Throughout Plaintiff's period of employment, and from at least October 2018 through the end of his employment in October 2022,

TEHCI addressed all of his wage statements to a residential address that he provided in Altadena, California. Rutschman Decl. ¶ 23, Ex. I.

60. During the second session of his deposition on March 17, 2026, Plaintiff testified that he resides in Pasadena, California, which is in Los Angeles County. Rutschman Decl. ¶ 14. He testified he had lived there since March 2025. *Id.* Prior to that, Plaintiff testified he lived in Altadena, California for approximately 18 years and that his house in Altadena, which he unfortunately lost in the Eaton fires, is "still my residence." *Id.* Plaintiff testified that he does not have any intention of moving anywhere, until his home in Altadena is rebuilt. *Id.*

61. As a result, Plaintiff is domiciled in California and is therefore a citizen of California.

62. **<u>Defendants' Citizenship.</u>** The citizenship of a corporation is both the state of its incorporation and the state of its principal place of business. 28 U.S.C. §1332(c)(1). When determining a corporation's principal place of business for purposes of diversity jurisdiction, courts refer to the place where a corporation's officers direct, control, and coordinate the corporation's activities. *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). The principal place of business is where the corporation "maintains its headquarters—provided that the headquarters is the actual center of direction, control and coordination." *Id.*

a. <u>Citizenship of Defendant Elevance Health, Inc.</u> Elevance Health, Inc. is incorporated in Indiana, and its principal place of business is in Indianapolis, Indiana as the company performs the vast majority of its executive and administrative functions at its corporate headquarters in that location. A true and correct copy of Elevance Health, Inc.'s most recent Statement of Information filed with the California Secretary of State on October 17, 2026, obtained from the California Secretary of State's website at https://bizfileonline.sos.ca.gov on November 23, 2026, is attached to the concurrently filed Request for Judicial Notice ("RJN") as Exhibit K. The Statement of Information identifies Indianapolis,

Indiana as the location of its principal office and Indiana as its place of incorporation. (Ex. L.) Therefore, Elevance Health, Inc. is a citizen of Indiana.

b. The Elevance Health Companies, Inc. was formerly The Anthem Companies, Inc. On or about August 29, 2022, TEHCI filed a Certificate of Amendment amending its corporate name from The Anthem Companies, Inc. to TEHCI. (RJN, Ex. M.) The Certificate of Amendment identifies Indiana as its place of incorporation. A true and correct copy of TEHCI's Certificate of Amendment filed with the California Secretary of State on August 29, 2022, obtained from the California Secretary of State's website at https://bizfileonline.sos.ca.gov/search/business on November 23, 2026, is attached to the concurrently filed RJN as Exhibit M.

c. Citizenship of The Elevance Health Companies, Inc. TEHCI is incorporated in Indiana, and its principal place of business is in Indianapolis, Indiana as the company performs the vast majority of its executive and administrative functions at its corporate headquarters in that location. A true and correct copy of TEHCI's most recent Statement of Information filed with the California Secretary of State on September 29, 2026, obtained from the California Secretary of State's website at https://bizfileonline.sos.ca.gov on November 23, 2026, is attached to the concurrently filed RJN as Exhibit N. The Statement of Information identifies Indianapolis, Indiana as the location of its principal office and Indiana as its place of incorporation. (Ex. N.) Therefore, TEHCI is a citizen of Indiana.

d. Citizenship of Susan Millet-Reilly. Individual Defendant Susan Millet-Reilly currently resides in Connecticut, and she has resided there since 2004. *See* Declaration of Susan Millet-Reilly, ¶¶ 1-2. She has no intent to relocate outside of Connecticut or otherwise change her state of residence. *Id.* Finally, Plaintiff's Complaint acknowledges that Ms. Millet-Reilly is a resident of Connecticut. As a result, Ms. Millet-Reilly is domiciled in Connecticut and is

therefore a citizen of Connecticut. Defs. Index of Exhibits, Volume 1, Ex. 3., Compl. ¶ 12.

e. Citizenship of Unnamed "Doe" Defendants. The defendants Plaintiff designates as Does 1 to 50 in the Complaint are fictitious defendants and are not parties to this action. Unnamed defendants, such as Doe defendants, are not required to join in a removal petition. The Court may therefore disregard their citizenship for purposes of determining diversity jurisdiction. 28 U.S.C. § 1441(b)(1); *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980).

63. **Amount in Controversy**. Defendants allege that based on Plaintiff's Complaint, it is facially apparent that the amount in controversy in this action exceeds the jurisdictional sum or value of $75,000. "The calculation of the amount in controversy takes into account claims for 'general' damages,' 'special' damages, punitive damages if recoverable as a matter of law." *Rippee v. Boston Mkt. Corp.*, 408 F. Supp. 2d 982, 984 (S.D. Cal. 2005); *see e.g.*, *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005), *as amended on denial of reh'g and reh'g en banc* (Feb. 13, 2006) (factual allegations in the Complaint, along with the types of damages plaintiff sought made it facially apparent that the amount in controversy exceeded the $75,000 jurisdictional amount).

a. Compensatory Damages. Plaintiff alleges that as a result of Defendants' conduct, he has sustained "loss of earning and future earning capacity." (Defs.' Index of Exhibits, Volume 1, Ex. 3., Compl. ¶¶ 46, 52, 58, 64, 70, 77, 83, 89, 97, 104, 114, 119.) Plaintiff also prays for "general damages." (*Id.* Prayer, ¶ 1.)

b. At the time Elevance Health, Inc. terminated Plaintiff's employment in October 2022, it employed him full time and paid him a salary of $147,000.00. Defs.' Index of Exhibits, Volume 1, Ex. 3., Compl. ¶ 16. Plaintiff was also eligible for a performance bonus of up to $21,488, for a total annual salary of $168,488.00.

c. Pursuant to his verified discovery responses, Plaintiff has mitigated his damages by securing replacement employment beginning in May 2023. Rutschman Decl. ¶ 23, Ex. J. Plaintiff's starting salary was $150,009. *Id.* On or about April 1, 2024, it was increased to $154,523.20. *Id.* On or about March 31, 2025, it was increased to $159,932.20. *Id.*

d. Thus, if Plaintiff were to be able to recover back wages spanning from the date of the termination of his employment to the date of this Removal (which Defendants contend he is not entitled to), less the amount he mitigated his damages by, Plaintiff would be entitled to approximately **$138,778.85** in back wages (approximately $93,706.86 in pre-replacement wages and $45,071.99 in post-replacement differential wages). This alone satisfies the amount in controversy.

e. Assuming this case proceeds to trial in November 2027 (approximately one year after the Removal), and assuming that Plaintiff's current salary does not increase, he will claim entitlement to an additional twelve (12) months of post-replacement differential wages, amounting to an additional **$8,555.80**.

f. Additionally, in California, front pay awards frequently span a number of years. *See Smith v. Brown-Forman Distillers Corp.*, 196 Cal. App. 3d 503, 518 (1987) (upholding an award of front pay until mandatory retirement age reached); *Rabago-Alvarez v. Dart Indus., Inc.*, 55 Cal. App. 3d 91, 97 (1976) (awarding a front pay award spanning over a four-year period); *Drzewiecki v. H&R Block, Inc.*, 24 Cal. App. 3d 695, 705 (1972) (where the front pay award totaled 10 years). Assuming that Plaintiff seeks a front pay award of at least two years, that would amount to $17,111.60 (2 years x $8,555.80 post-replacement wage differential), for a total of approximately **$164,446.25** in front pay and back pay damages. Therefore, without even considering the other damages Plaintiff is seeking, including emotional distress damages, punitive damages, and attorneys'

fees, the compensatory damages alone will qualify this case and exceed the $75,000 threshold.

g. Emotional Distress Damages. Plaintiff further claims he "has been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, shame, embarrassment, fright, shock, anxiety, pain, discomfort, and physical sickness and/or injury." (*See* Defs.' Index of Exhibit Volume 1, Ex. 3, Compl. ¶¶ 47, 53, 59, 65, 71, 78, 84, 90, 98, 105, 115, 120.) Plaintiff prays for "special damages." (*Id.*, Prayer ¶ 2.) Emotional distress damages may be considered when calculating the amount in controversy even when not clearly pled in the Complaint. *Simmons v. PCR Tech.*, 209 F. Supp. 2d 1029, 1034 (N.D. Cal. 2002) (noting that while a retaliation case brought by a former employee would likely not result in an award of $3.5 million dollars in emotional distress damages, the court noted that "emotional distress damages in a successful employment discrimination case may be substantial"); *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 450 (S.D. Cal. 1995) ("[t]he vagueness of plaintiffs' pleadings with regard to emotional distress damages should not preclude this Court from noting that these damages are potentially substantial"). In addition to Plaintiff's claims for compensatory damages, his claimed emotional distress damages clearly demonstrate that the amount in controversy exceeds the $75,000 threshold.

h. Punitive Damages. Plaintiff also seeks to recover punitive damages. (*See* Defs.' Index of Exhibit Volume 1, Ex. 3, Compl. ¶¶ 48, 54, 60, 66, 72, 79, 85, 91, 99, 106, 116, Prayer ¶ 3.) Although California law does not provide any specific monetary limit on the amount of punitive damages that may be awarded pursuant to section 3294 of the California Civil Code, the proper amount of punitive damages under California law is generally based on the reprehensibility of a defendant's misdeeds, the ratio between compensatory and punitive damages, and ratio between damages and the defendant's net worth. *See Boyle v. Lorimar Prods., Inc.*, 13 F. 3d 1357, 1360 (9th Cir. 1994). Punitive damages are included in

calculating the amount in controversy. *See Davenport v. Mut. Ben. Health & Acc. Ass'n*, 325 F.2d 785, 787 (9th Cir. 1963); *see also Aucina v. Amoco Oil Co*., 871 F. Supp. 332, 334 (S.D. Iowa 1994). In *Aucina*, the employer-defendant established that the amount in controversy exceeded the jurisdictional minimum where the former employee asserted claims for lost wages, lost benefits, mental anguish, and punitive damages. *Aucina*, 871 F. Supp. at 334. The court noted that "[b]ecause the purpose of punitive damages is to capture a [D]efendant's attention and deter others from similar conduct," punitive damages alone could exceed the jurisdictional threshold amount of $75,000 on its own. *Id.*

i. Attorneys' Fees. Plaintiff also seeks to recover attorneys' fees. (*See* Defs.' Index of Exhibit Volume 1, Ex. 3, Compl. ¶¶ 39, 46, 49, 52, 55, 58, 61, 64, 67, 70, 73, 77, 80, 83, 86, 89, 92, 97, 101, 104, 107, 109, 111, 114, 119, Prayer ¶ 6.) "[W]here an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy." *Galt G/S v. JSS Scandinavia*, 142 F. 3d 1150, 1156 (9th Cir. 1998). "When assessing the amount in controversy, the court considers the amount of attorneys' fees to be accrued throughout the entirety of the litigation." *Cain v. Hartford Life and Acc. Ins. Co.*, 890 F. Supp. 2d 1246, 1250 (C.D. Cal. 2012), *citing Simmons*, 209 F. Supp. 2d at 1034; *see also Sasso v. Noble Utah Long Beach, LLC*, No. CV 14-09154-AB (AJWx), 2015 WL 898468, at *5 (C.D. Cal. Mar. 3, 2015); *Garcia v. ACE Cash Express, Inc.*, No. SACV 14-0285-DOC (RNBx), 2014 WL 2468344, at *5 (C.D. Cal. May 30, 2014). "[T]he Court can use its discretion to determine, within its own experience, that an award of attorneys' fees alone will satisfy the amount in controversy requirement." *James Dickey, Inc. v. Alterra Am. Ins. Co.*, No. 2:15-cv-00963-ODW-DTB, 2015 WL 4537732, at *3 (C.D. Cal. July 27, 2015), citing *Cain v. Hartford Life & Acc. Ins. Co.,* 890 F. Supp. 2d 1246, 1250 (C.D. Cal. 2012). As such, even a minimum award of attorneys' fees "would place the amount in controversy well in excess of $75,000." *Haase v. Aerodynamics Inc.*,

No. 2:09-cv-01751-MCE-GGH, 2009 WL 3368519, at *3, *5 (E.D. Cal. Oct. 19, 2009) (internal citations omitted). When calculating attorneys' fees for the amount in controversy, courts routinely recognize that attorneys representing a single plaintiff in an employment dispute may reasonably spend at least 100 billable hours on a case. *Sasso*, 2015 WL 898468, at *6 (reasonable attorneys' fees in a single-plaintiff matter with only four causes of action "may reasonably be expected to equal at least" 100 hours); *Cagle v. C & S Wholesale Grocers, Inc.*, No. 2:13-CV-02134-MCE-KJN, 2014 WL 651923, at *11 (E.D. Cal. Feb. 19, 2014) (100 billable hours was "a reasonable and good faith estimate of the expected fees" in a single-plaintiff employment matter that included wage claims); *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 225 (9th Cir. 2013) (finding that an attorneys' fees award for 1,610.8 total billable hours was reasonable where counsel argued multiple single-plaintiff FEHA discrimination claims through trial).

j. If Plaintiff's counsel prosecutes this matter through trial, he will spend at least 250 to 450 billable hours (a conservative estimate) litigating this case with six (6) individual claims. Even if Plaintiff sought to recover attorneys' fees at a *very* conservative rate of $300 per hour, Plaintiff's entitlement to statutory attorneys' fees would conservatively range from $75,000 to $135,000—an amount that would, on its own, meet or exceed the jurisdictional threshold. Of course, this assumption does not take into account the reality that Plaintiff's counsel would like seek to recover for a higher hourly rate(s) and whether Plaintiff's counsel will increase his hourly rate(s) by the time this matter concludes through trial.

k. Accordingly, the amount in controversy in this action exceeds the jurisdictional sum or value of $75,000.

## CONCLUSION

64. Complete diversity of citizenship exists because Plaintiff is a citizen of California, Defendants Elevance Health, Inc. and The Elevance Health Companies, Inc. (f/k/a The Anthem Companies, Inc.) are citizens of Indiana,

individual Defendant Susan Millet-Reilly is a citizen of Connecticut, and the amount in controversy exceeds $75,000. Accordingly, this Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. §§1332, 1441, and 1446, and Defendants have properly removed the State Court Action to this Court.

WHEREFORE, Defendants pray that the State Court Action be removed from the Superior Court of California, County of Los Angeles, to this Court.

Dated: November 24, 2026 **MAYNARD NEXSEN LLP**

By: ______________________________
Thy B. Bui
Aaron M. Rutschman
David Crane
Attorneys for Defendants
ELEVANCE HEALTH, INC.; THE ELEVANCE HEALTH COMPANIES, INC. (f/k/a THE ANTHEM COMPANIES, INC.); and SUSAN MILLET-REILLY